

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-9-1997

# Latessa v. NJ Racing Comm

Precedential or Non-Precedential:

Docket 96-5316

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"Latessa v. NJ Racing Comm" (1997). *1997 Decisions.* Paper 100.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/100

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed May 9, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-5316

DONATO P. LATESSA; VICTORIA R. LATESSA,

Appellants,

v.

NEW JERSEY RACING COMMISSION; SANTO LALOMIA,
INDIVIDUALLY AND OFFICIALLY AS A MEMBER OF THE
NEW JERSEY RACING COMMISSION; OLIVER R.
KOVACS, INDIVIDUALLY AND OFFICIALLY AS A
MEMBER OF THE NEW JERSEY RACING COMMISSION;
STUART O. GOLDSMITH, INDIVIDUALLY AND
OFFICIALLY AS A MEMBER OF THE NEW JERSEY
RACING COMMISSION; WILLIAM E. MCGLYNN,
INDIVIDUALLY AND OFFICIALLY AS A MEMBER OF THE
NEW JERSEY RACING COMMISSION; DANIEL A.
MONACO, DR., INDIVIDUALLY AND OFFICIALLY AS A
MEMBER OF THE NEW JERSEY RACING COMMISSION;
FRANK ORECHIO, INDIVIDUALLY AND OFFICIALLY AS A
MEMBER OF THE NEW JERSEY RACING COMMISSION;
SAVINO J. RUSSONIELLO, JR., INDIVIDUALLY AND
OFFICIALLY AS A MEMBER OF THE NEW JERSEY
RACING COMMISSION; SAMUEL M. CANNELLA,
INDIVIDUALLY AND OFFICIALLY AS A MEMBER OF THE
NEW JERSEY RACING COMMISSION; PETER J.
COFRANCESCO, JR., INDIVIDUALLY AND OFFICIALLY AS
A MEMBER OF THE NEW JERSEY RACING
COMMISSION; FRANCESCO ZANZUCCKI, INDIVIDUALLY
AND AS DIRECTOR OF THE NEW JERSEY RACING
COMMISSION; MICHAEL VUKCEVICH, INDIVIDUALLY
AND AS DEPUTY DIRECTOR OF THE NEW JERSEY
STATE RACING COMMISSION,

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civ. No. 94-cv-05946)

Argued February 7, 1997

Before: STAPLETON and MANSMANN, <u>Circuit Judges</u>,
RESTANI, <u>Judge</u>, Court of International Trade.*

(Filed May 9, 1997)

August R. Soltis (Argued)
Iulo & Rowek
165 Prospect Street
Passaic, New Jersey 07055
 COUNSEL FOR APPELLANTS

Peter Verniero
Attorney General of New Jersey
Joseph L. Yannotti
Assistant Attorney General,
 of counsel
Jed M. Milstein
Deputy Attorney General
Pamela B. Katten (Argued)
Senior Deputy Attorney General
Richard J. Hughes Justice Complex
CN 112
Trenton, New Jersey 08625
 COUNSEL FOR APPELLEES

**OPINION OF THE COURT**

RESTANI, <u>Judge</u>.

Appeal is from a grant of summary judgment in favor of
the defendant, New Jersey Racing Commission

_____

*The Honorable Jane A. Restani, Judge, United States Court of
International Trade, sitting by designation.

2

("Commission") and various of its employees. Appellant challenges his non-reappointment as a racing judge following his criticism of Commission executives' actions in connection with penalty adjudication and his public testimony about the same. He alleges violation of his Fourteenth Amendment due process rights, his First Amendment free speech rights, and the New Jersey Conscientious Employee Protection Act, N.J. Stat. Ann. § 34:19-1 et seq. (West 1996).1 We review the summary judgment record in the light most favorable to the appellant, the non-moving party. We will affirm as to the Fourteenth Amendment causes of action, but will reverse and remand for fact-finding as to the First Amendment claim and the related state law claim.

## FACTS

Defendant New Jersey Racing Commission is a body created by N.J. Stat. Ann. § 5:5-22 (West 1996) with jurisdiction, powers and duties overseeing horse racing conducted in the State of New Jersey. Defendant Francesco Zanzuccki is the Executive Director of the New Jersey Racing Commission, and defendant Michael Vukcevich is the Deputy Director of the New Jersey Racing Commission.

In 1985, Mr. Latessa was licensed by the United States Trotting Association as an Associate Judge with powers to officiate as a judge at harness horse meets. In the latter part of 1985, he began working at various race tracks in New Jersey as either a Patrol Judge or an Associate Judge. Mr. Latessa was first appointed by the Commission as Presiding Judge at Garden State Park in 1988 and was also appointed to that position at the Meadowlands Race Track ("The Meadowlands") in 1992.

In New Jersey, racing judges are appointed on a meet-by-meet basis. N.J. Stat. Ann. § 5:5-37(a) (West 1996). They are paid on a weekly basis and do not receive fringe benefits. See id. They serve at the pleasure of the Commission. N.J. Stat. Ann. § 5:5-37(a).

---

1. To the extent Latessa pursues a common law wrongful discharge claim on appeal, Latessa may not pursue that claim on remand because he failed to raise it before the district court in the first instance.

3

Penalty decisions are made in the first instance by certain officials employed by the Commission, including panels of judges. N.J. Admin. Code tit. 13, § 71-1.20(b) (1990). The Commission itself may modify a penalty decision. Id. § 71-1.23. Thereafter, appeal may be filed with the Commission, but the Commission may reject or modify on its own motion any imposed penalty or decision. Id. § 71-3.3 (1995). Sometime in early 1993, Mr. Zanzuccki and Mr. Vukcevich began making penalty "recommendations" in horse drugging cases prior to the formal action of the three judge panel authorized to take initial action in such matters.

In July of 1993, Mr. Zanzuccki told Mr. Latessa that a 120-day penalty should be imposed on Thomas Milici, a horse trainer accused of administering an illegal drug, by the panel of judges which included Mr. Latessa. Mr. Latessa did not demur, but rather advised the panel of Mr. Zanzuccki's statement. The other judges disagreed, believing that the penalty would be inconsistent with penalties imposed in like circumstances previously and imposed a 90-day sentence. Mr. Latessa did not register a contrary vote.

Mr. Zanzuccki was not pleased with the outcome of the Milici matter and demanded reports from the three judges as to what had occurred. The other two judges did not discuss what had occurred procedurally, but reported on the substance of their reasoning. Mr Latessa described similar reasoning, but also indicated that while he had advocated Mr. Zanzuccki's preferred penalty, he had been outvoted. Follow-up questioning of the other judges indicated to Mr. Zanzuccki that Mr. Latessa's "advocacy" did not go beyond reporting Mr. Zanzuccki's statement and that Mr. Latessa registered no formal dissenting vote.

During the summer of 1993, Mr. Zanzuccki continued to either recommend or direct drug violation penalties prior to the completion of proceedings before the panel of racing judges. It was in connection with one of these cases that Mr. Latessa later gave testimony before the Office of Administrative Law about the early intervention of Mr. Zanzuccki in the proceedings.

4

At the end of the summer Mr. Latessa was reappointed as the Presiding Judge for the upcoming harness racing meet at Garden State Park. During the early fall Mr. Latessa, Mr. Vukcevich, and Mr. Zanzuccki continued to disagree about the manner in which the Milici matter was handled. In the first week of November, during a racing meet in California, Santo Lalomia, Chairman of the New Jersey Racing Commission, interviewed Michael Corley for the position of Presiding Judge. On November 16, 1993, Mr. Zanzuccki requested a meeting with Mr. Latessa scheduled for November 30, 1993. On November 19, 1993, Mr. Vukcevich sent Mr. Latessa a memorandum noting the "inconsistent" accounts of the Milici deliberations, as well as other points of disagreement. On November 22, 1993, Mr. Latessa testified before the Office of Administrative Law and one day later Mr. Zanzuccki sent a memorandum to Mr. Lalomia indicating he had decided not to reappoint Mr. Latessa. The administrative law judge credited Mr. Latessa's testimony and issued an opinion on November 29, 1993, critical of the actions of Mr. Zanzuccki and his deputy. The administrative law judge said in part:

The impartiality of the agency head - the NJRC - will be compromised <u>if</u> the Executive Director and/or Deputy Director participate in any advisory capacity concerning the penalty issue. The Executive Director and Deputy Director have already instructed the judges to impose a two-year suspension. The Deputy Director and Executive Director have in the past discussed penalty with the NJRC after an ALJ issued a decision, thereby making the proceedings before the OAL seem rather superfluous. "The primary reason for establishing the [OAL] was `to bring impartiality and objectivity to agency hearings and ultimately to achieve higher levels of fairness in administrative adjudications.' " <u>In re Uniform Administrative Procedure Rules</u>, 90 <u>N.J.</u> 85, 90 (1982) (citation omitted); . . .

 While an administrative agency has the ultimate authority to adopt, reject or modify an ALJ's recommended findings of fact and conclusions of law, "the agency head must base the final decision solely on the record established at the hearing." <u>Matter of</u>

5

<u>Opinion No. 583</u>, <u>supra</u>, 107 <u>N.J.</u> at 238. Thus, if the
NJRC considers "other" information from the Executive
Director and Deputy Director, the very individuals who
proposed the penalty in this case, then the NJRC, as
the final authority, would be admitting new evidence
that neither the opposing party nor this ALJ had the
opportunity to consider. Such actions, if permitted,
would undermine the very purpose of the OAL
proceeding. On a lesser scale of importance, but
significant, and equally troubling, is the apparent
blending of functions that seems to be common
practice at the NJRC. Presiding Judge Latessa plainly
acknowledged that he did not feel that the judges could
do anything but follow the penalty proposed. From his
testimony, a licensee, like Rubin, must question how
impartial is such a hearing and, even assuming that
there is nothing wrong with this practice, which seems
to be at odds with basic due process notions, there is
an [sic] least an appearance of impropriety. Such
practices place individuals of high integrity, like
Latessa and Gallagher, who essentially serve at the
pleasure of the NJRC, in a difficult and possibly a
compromising position. The potential for abuse is
present and carried to its logical extreme, could result
in the dismissal of a conscientious judge or steward.

App. at 195-96 (emphasis in original).

On December 3, 1993, Mr. Corley was recommended as
the replacement for Mr. Latessa at the 1994 Meadowlands
Harness Race Meeting.

**Discussion**

**I**

Pursuant to 28 U.S.C. § 1291 we have jurisdiction to
decide this appeal from a final decision of the district court.
The district court had jurisdiction under 28 U.S.C. § 1331
as plaintiff brought claims under 42 U.S.C. SS 1981, 1983,
1985 and 1988.2

_____

2. The district court's dismissal of appellants' claim under 42 U.S.C.
§ 1985(2) is not the subject of the appeal. The district court indicated

6

As this matter comes to us following a grant of summary judgment under Fed. R. Civ. P. 56 in favor of defendants on all claims, review is plenary. Jefferson Bank v. Progressive Cas. Ins. Co., 965 F.2d 1274, 1278 (3d Cir. 1992). We also address whether the district court abused its discretion in denying leave to amend the complaint under Fed. R. Civ. P. 15(a) to add new state law claims. Douglas v. Owens, 50 F.3d 1226, 1235 (3d Cir. 1995).

Mr. Latessa alleges three causes of action under 42 U.S.C. § 1983 based on deprivation of federal constitutional rights. First, he alleges violation of his Fourteenth Amendment due process rights stemming from his liberty interest in remaining free to work as a racing judge. Second, he alleges violation of his Fourteenth Amendment due process rights stemming from his property interest in his position as Presiding Judge for the New Jersey Racing Commission. Third, he alleges violation of his free speech rights under the First Amendment. We will address these issues in the order set forth.

**II**

Mr. Latessa alleges violation of his Fourteenth Amendment due process rights stemming from his liberty interest in remaining free to work as a racing judge. The liberty interest at issue is the right to "pursue a calling or occupation, and not the right to a specific job." Piecknick v. Commonwealth of Pennsylvania, 36 F.3d 1250, 1259 (3d

---

that no claim existed under 42 U.S.C. § 1981 and plaintiff presented no arguments on appeal indicating he has such a claim. Thus, we affirm dismissal of the action as to that section. The district court also indicated that the parties were in agreement that the Eleventh Amendment requires dismissal of the federal causes of action against the state agency defendant. While claims based on statutes implementing the Fourteenth Amendment are not barred by the Eleventh Amendment if the intent to abrogate state immunities is clear, see Seminole Tribe of Florida v. Florida, 116 S. Ct. 1114, 1131 n.15 (1996), here, the parties agreed that the Commission is a state agency and not a "person" for purposes of 42 U.S.C. § 1983. See Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989). Waiver of immunity for the state law claims was not addressed.

7

Cir. 1994) (quoting <u>Wroblewski v. City of Washburn</u>, 965 F.2d 452, 455 (7th Cir. 1992)).

We affirm the district court's grant of summary judgment against Mr. Latessa as "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986). Mr. Latessa failed to present any support for his contention that due to his non-reappointment he was effectively banned from all work in his occupation as a racing judge. In response to the motion for summary judgment he offered neither affidavits nor evidence of unsuccessful attempts to secure such employment following the non-reappointment at The Meadowlands.3 Mr. Latessa worked at tracks other than The Meadowlands and he did not attempt to establish that employment at other venues was not reasonably available to him. Moreover, Mr. Latessa offers no support for the proposition that he was unreasonably restricted in his ability to pursue his chosen occupation. Thus, the district court appropriately granted defendants' summary judgment on Mr. Latessa's claim of deprivation of a liberty interest without due process of law in violation of the Fourteenth Amendment.

**III**

In order to succeed on a claim of deprivation of due process under the Fourteenth Amendment with respect to termination of a specific employment position, a plaintiff must first establish a property interest in the employment. <u>Board of Regents of State Colleges v. Roth</u>, 408 U.S. 564, 576 (1972). To have a property interest in a job or job benefit, an employee must have a legitimate claim of entitlement, not just a unilateral expectation. <u>Id.</u> at 577. Mr. Latessa lacked a legitimate claim of entitlement to his position. The parties do not dispute that New Jersey racing judges are appointed on a meet-by-meet basis, paid on a weekly basis, and receive no fringe benefits. Moreover, they

---

3. Following the non-reappointment, he did work as a racing judge in Maryland for a short time, but he found it unacceptable for geographical reasons.

8

serve at the pleasure of the New Jersey Racing Commission. See N.J. Stat. Ann. § 5:5-37(a). Thus, if only the statute were at issue, we would conclude that Mr. Latessa was an at-will employee without a property interest in his employment as a racing judge.4

Property interests in employment may also arise, however, from " `mutually explicit understandings' between a government employer and employee." Stana v. School Dist. of City of Pittsburgh, 775 F.2d 122, 126 (3d Cir. 1985). Mr. Latessa asserts there is a triable issue of fact as to the existence of a property interest based on such understandings. He points to the deposition of Santo Lalomia, a defendant and Chairman of the New Jersey Racing Commission in support. In his deposition, Mr. Lalomia indicated that there was little turnover in the racing judge appointments, and "generally speaking" if one "keeps his nose clean" and lives up to expectations, employment would continue. This generalized statement is insufficient to create a position requiring just cause as a prerequisite for involuntary termination.

Mr. Latessa suggests the mutual understanding described by Mr. Lalomia's deposition testimony is similar to the understanding documented in Perry v. Sindermann, 408 U.S. 593, 601 (1972).5 Perry, however, is distinguishable. In that case, plaintiff alleged a de facto tenure program for college professors "secured by `existing rules or understandings.' " Id. (citing Roth, 408 U.S. at 577). The plaintiff alleged that the mutual understanding of continued employment was documented in the employer's official faculty guide which stated a faculty member "has permanent tenure as long as his teaching services are

_____

4. We assume for the sake of argument that the legislature has not barred the Commission from granting employment rights of the type claimed here.

5. The Supreme Court in Perry did not hold that the plaintiff had a legitimate claim of entitlement to job tenure. Id. at 602. Instead, it found that the plaintiff had alleged the existence of rules and understandings that "may justify his legitimate claim of entitlement to continued employment absent `sufficient cause' " and remanded to the district court to make such a determination. Id. at 602-03.

satisfactory . . . ." Id. at 600. Moreover, plaintiff relied upon Guidelines promulgated by the Coordinating Board of the Texas College and University System which stated if employed for seven years, the employee has some form of job tenure. Id. Mr. Latessa, however, has pointed to no evidence of such rules or understandings as to racing judges. The very generalized testimony cited does not reflect a specific bilateral understanding that particular cause must be shown before non-reappointment may occur. Thus, the district court correctly granted summary judgment to defendants on the basis of no triable issues of fact as to the existence of a property interest in plaintiff's position as racing judge.

**IV**

Unlike Fourteenth Amendment due process rights, appellant's First Amendment right to be free from retaliation for speech is not defeated by the lack of a property or liberty interest in his employment. Id. at 599. A public employee's claim of retaliation for a protected activity, here speech, is analyzed in three steps. Green v. Philadelphia Hous. Auth., 105 F.3d 882, 885 (3d Cir. 1997); Pro v. Donatucci, 81 F.3d 1283, 1288 (3d Cir. 1996); Watters v. City of Philadelphia, 55 F.3d 886, 892 (3d Cir. 1995). First, the plaintiff must demonstrate that his speech was protected. Green, 105 F.3d at 885. Second, the plaintiff must show that the speech was a motivating factor in the alleged retaliatory action. Id. Third, the defendant may defeat the plaintiff's claim by establishing that the adverse action would have been taken even in the absence of the protected speech. Id.

The district court focused on Mr. Latessa's testimony of November 22, 1993 before the New Jersey Office of Administrative Law which indicated that Mr. Latessa did not feel free to disagree with the penalty recommendations of Mr. Zanzuccki. The court determined that the decision not to reappoint Mr. Latessa occurred prior to November 22, 1993, and thus the testimony could not have been a motivating factor in the alleged retaliatory non-reappointment.

10

In denying defendants' prior motion to dismiss, the district court had found that Mr. Latessa raised issues potentially satisfying the first prong of the test. For speech by a government employee to be protected, it must be regarding a public concern, as opposed to employment matters unrelated to such concerns. See Connick v. Myers, 461 U.S. 138, 142 (1983); Azzaro v. County of Allegheny, No. 95-3253, 1997 WL 170285 (3d Cir. Apr. 11, 1997). Furthermore, we held in Green that a public employee's truthful testimony before a government adjudicating or fact-finding body, whether pursuant to a subpoena or not, is a matter of public interest. 105 F.3d at 887. Thus, Mr. Latessa's testimony before the Office of Administrative Law is a matter of public concern.

A balancing test exists to determine if such public concern speech by a government employee is protected. See Pickering v. Board of Educ. of Township High Sch. Dist. 205, Will County, Illinois, 391 U.S. 563, 568 (1968). The public interest favoring expression "must not be outweighed by any injury the speech could cause to the interest of the state as an employer in promoting the efficiency of the public services it performs through its employees." Watters, 55 F.3d at 892. Under the test, the government must show that the public concern value of the speech was likely to be outweighed by the disruption. Id. at 896 (applying new test of Waters v. Churchill, 511 U.S. 661, 673 (1994)).

Appellees' position is that Mr. Latessa was fired for "lying" in conversation and memoranda between Mr. Latessa and Mr. Zanzuccki, not because Mr. Latessa's testimony critical of administrative procedures was likely to be disruptive. Thus, for purposes of this appeal, the public concern speech represented by the testimony is treated as protected speech and the issue of whether Mr. Latessa was not reappointed in retaliation for his testimony must be addressed. For the following reasons we find this issue cannot be resolved as a matter of law.

First, although Mr. Latessa had previously complained internally about what he believed was Mr. Vukcevich's and Mr. Zanzuccki's unlawful interference in the initial stages of the penalty proceedings, his public testimony occurred one day before Mr. Zanzuccki's memorandum indicating Mr.

11

Latessa would not be recommended for reappointment. Second, even though Mr. Latessa's eventual replacement, Mr. Corley, was interviewed before the testimony, there is no indication that a decision to appoint him had been made before the testimony.6

Moreover, a fact-finder reasonably might view the accusation of "lying" as mere pretext. See Waters v. Churchill, 511 U.S. at 677 (employer may not rely on unreasonable conclusion as to what was said as pretext for firing because of protected speech). Here, the "lie" was Mr. Latessa's statement representing his presentation of Mr. Zanzuccki's "recommendation" to the panel of judges in the Milici matter as "advocacy." The "lie" may also have included his characterization of his action in the Milici matter as either a vote, a lack of a vote or the Commission's vote. While a trier of fact might conclude Mr. Latessa was fired because he was reasonably perceived to be lying, based on the evidence a trier of fact might also conclude otherwise. Given the fluidity of the panel deliberations, there may have been no "lie" in the sense of a knowingly false statement, and a trier of fact might conclude that Mr. Zanzuccki perceived just that and fired Mr. Latessa for the protected speech before the Office of Administrative Law. In view of the content of Mr. Latessa's speech, its temporal relation to the first indication in the record of a decision not to reappoint, and because a fact finder might reasonably reject as pretext the "lie" explanation for non-reappointment, a fact finder might also reasonably conclude that the testimony was the final straw, and hence a motivating factor for the failure to reappoint.

In summary, as we view the current record, Mr. Latessa has marshaled substantial evidence tending to support the proposition that his testimony, rather than any lack of personal integrity in connection with the Milici matter, caused his non-renewal. First, Mr. Latessa had served for many years as a judge without challenge to his integrity.

_____

6. The prior scheduling of a meeting between Mr. Zanzuccki and Mr. Latessa for November 30, 1993 is not determinative, because the record does not reveal what the purpose of the meeting was at the time of scheduling.

12

Second, Mr. Latessa's letters of July 13 and July 21, which are said by appellee to have demonstrated Mr. Latessa's lack of personal integrity in the Milici matter, are at best ambiguous and could be found by a reasonable trier of fact to be entirely consistent with his being qualified to serve as a judge. Third, Mr. Latessa was reappointed as the Presiding Judge for the fall meet on August 23, 1993, more than a month after he is said to have demonstrated this lack of personal integrity. Fourth, prior to his testimony before the Administrative Law Judge on November 22, 1993, there is no documentation of a decision having been made by anyone not to renew Mr. Latessa. Fifth, Mr. Latessa's testimony before the Administrative Law Judge could be regarded by a trier of fact as very embarrassing to Zanzuccki, Vukcevich and the Commission. And, finally, on November 23, 1993, the day after this potentially embarrassing testimony was given, Zanzuccki wrote a letter to the Chairman of the Commission advising him that he intended to notify Latessa on November 30 that he would not be renewed. This letter is significant not only because it is the first documentation of a decision by anyone not to renew, but also because it reveals that Zanzuccki was then lobbying for the support of the Chairman and did not regard the non-renewal decision to be a fait accompli.

Accordingly, we will remand to the district court because the second prong of the three-step analysis requires a factual determination as to whether Mr. Latessa's November 22, 1993 testimony was a motivating factor in the decision not to reappoint him as a Presiding Judge.

Furthermore, the district court appears to have ruled alternatively that even if the protected conduct was a motivating factor in Latessa's reappointment, for independent reasons he would not have been reappointed. See Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 285 (1977). If viewed in the light most favorable to plaintiff, the facts discussed previously do not permit summary judgment for defendant on this ground.

V

It is unclear from the presentation of this case as to whether Mr. Latessa alleges his "vote" in the Milici matter

13

was protected speech and was part of the motivation for the non-reappointment. Mr. Latessa does allege that his right to vote freely in other cases was chilled by Mr. Zanzuccki's actions following the Milici matter. Numerous employment actions directed by an employer involve the medium of speech. All such actions do not become protected simply because some expression is involved. See Connick v. Meyers, 461 U.S. 138, 143 ("Government offices could not function if every employment decision became a constitutional matter."). While Mr. Latessa's public statements about the procedures affecting voting may be of public concern and hence protectable, his generalized allegation that he could not vote as he wished does not support a claim based on the First Amendment. The vote in any particular case was not improper compelled expression on a political or ideological matter. See, e.g., West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 642 (1943) (compulsion to salute flag and recite the pledge of allegiance invalid as "no official . . . can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein"). Nor was any particular penalty vote otherwise relevant to a self-governing society's ability to self-govern. See Azzaro, 1997 WL 170285, at *10. Mr. Latessa's complaints involved the procedure employed and it is his expression about such procedure that is of public concern.

Of more substance is Mr. Latessa's argument that he was discharged because of his ongoing internal objections to Mr. Zanzuccki's and Mr. Vukcevich's interference in initial penalty decision-making. Internal expression may also be protected. Id. ("Private dissemination of information and ideas can be as important to effective self-governance as public speeches."). Such claims must be analyzed under Connick v. Myers, 461 U.S. 138 (1983). In that case an assistant district attorney who was protesting transfer circulated an office questionnaire relating to internal office matters not of public concern and also relating tangentially to a matter of public concern, specifically, pressure to work in political campaigns. The question once more is to what degree the internal speech touches upon matters of public concern and to what degree effective functioning of the

14

governmental office is likely to be disrupted by the speech. See id. at 150. The Commission's burden in justifying its action "varies depending on the nature of the employee's expression." See id. For the following reasons, we remand this issue to the district court to apply the three step procedure set forth in Pickering and Connick, as modified by Waters.

First, appellees have not asserted directly any likely disruption to governmental functions as they continue to allege only that Mr. Latessa was fired for lying. See Connick, 461 U.S. at 150. Second, the balance in the internal complaints between nonpublic and public concerns is unclear. Mr. Vukcevich's memorandum of November 19, 1993, does reveal that Mr. Latessa was understood to be complaining about the intervention in initial penalty decision-making, as well as other matters of both public and personal concern. Third, the district court did not address whether the public concern portion of this internal speech, rather than the testimony only, was a motivating factor in the non-reappointment. Finally, although the district court concluded that early Commission intervention was not illegal, the New Jersey law is ambiguous. One could reasonably argue, as the administrative law judge noted upon hearing Mr. Latessa's testimony, that if the Commission decides from the outset what penalties should be imposed there is no point to a multi-layered adjudicatory system. In any case, the wisdom of the early intervention is a matter of public concern, even if it is not prohibited under current New Jersey law. Because Mr. Latessa's internal complaints about administrative procedures touch upon matters of public concern rather the issue of retaliatory action for internal speech must be remanded.

Mr. Latessa's state law claim was also dismissed because he did not establish that protected speech was a motivating factor in his nonreappointment. Thus, this claim will also be remanded. Because denial of plaintiff's motion to amend to add other state law claims apparently was based on the district court's dismissal of all federal claims, this issue will be remanded as well.7

_____

7. The district court did not state its reason expressly.

15

MANSMANN, Circuit Judge, concurring in the result in part and dissenting in part.

I agree with the majority that the district court properly granted the Commission's motion for summary judgment as to Latessa's Fourteenth Amendment claims. I also believe, however, that the district court was correct when it granted the Commission's motion as to Latessa's First Amendment claim. I would therefore affirm the judgment of the district court in all respects; I respectfully dissent in part.

I.

My disagreement with the majority stems from the policies and procedures of the Commission, and from the facts surrounding the Milici incident and Latessa's testimony. I therefore set forth my understanding of the undisputed facts at some length.

The Commission is a regulatory body responsible for overseeing all horse racing conducted in New Jersey. Horse racing occurs at three facilities in New Jersey, and each facility operates one "meeting" per year. Prior to each meeting, the Commission appoints a panel of one presiding judge and two associate judges to officiate and monitor horse races, review the conduct of race participants, and review the medical status of the horses. If it appears that an infraction has occurred, the judges conduct a hearing to determine the guilt or innocence of the accused. If an infraction is found, the judges are empowered to impose a penalty. While the judges impose penalties "in the first instance," N.J. Admin. Code tit. 13, § 71-1.20(b), the Commission is free to disregard the judges' decision and may impose a penalty of its choosing. Id. § 71-1.23.

The Commission appoints the judges on a meet-by-meet basis, and they serve "at the pleasure of the commission." N.J. Stat. Ann. § 5:5-37(a). At the conclusion of each meet, the judges are ordinarily (but not always) reappointed for the next meet. In 1985, the Commission appointed Latessa as an associate judge. For the next several years, the Commission regularly reappointed Latessa, eventually appointing him as the presiding judge.

16

In May 1993, two horses tested positive for prohibited drugs. After the trainers were found guilty of administering the drugs, but prior to the imposition of penalties, Francesco Zanzuccki, the Executive Director of the Commission, contacted Latessa. Zanzuccki told Latessa to impose a 120-day suspension on trainer Milici and a 90-day suspension on trainer Riegle. Latessa relayed Zanzuccki's recommendations to the other two judges on the panel, but the judges voted unanimously to impose a 90-day suspension on both trainers.

When Zanzuccki learned about the suspensions, he contacted Latessa to inquire about the deliberations. Latessa responded that he advocated the 120-day suspension for Milici but that he was outvoted two to one. Zanzuccki then contacted the two associate judges. Those judges did not state that Latessa had advocated or voted for the 120-day suspension, but stated that Latessa merely told them about the recommendation.

In a subsequent letter to Zanzuccki, Latessa stated that "[t]he vote was 2 to 1, to make it unanimous, I concurred." In a subsequent letter, however, Latessa stated that the "2 to 1" vote meant "2 associate votes to the 1 commission vote." In the second letter, Latessa added that he had always supported a 90-day suspension for Milici.

In his deposition, Zanzuccki testified that he believed that Latessa would advocate in favor of a 120-day suspension for Milici and that he was disturbed when he discovered that Latessa did not do so. Zanzuccki was also bothered by the fact that Latessa stated that he changed his vote to establish unanimity, when the purpose of a three-judge panel is to allow dissenting views. In addition, Zanzuccki was upset that Latessa originally stated that he voted for a 120-day suspension, but that he later stated that he always supported a 90-day suspension and that the "1" in the "2 to 1" vote represented a Commission vote. Finally, Zanzuccki believed that Latessa's statements about the deliberations and the vote were inconsistent with each other and with the statements of the associate judges.

Zanzuccki testified that the Commission decided not to reappoint Latessa in the early fall of 1993, and Latessa

17

does not offer any evidence to the contrary. On October 7, 1993, the Commission received a letter from Michael Corley expressing interest in the presiding judge position. In the first week of November, Commission Chairman Santo Lalomia interviewed Corley for the position.

By letter dated November 16, Zanzuccki requested that Latessa meet with Zanzuccki on November 30, 1993. Zanzuccki testified that he scheduled the meeting to inform Latessa about the Commission's decision not to reappoint him for another meet. Zanzuccki explained that the meeting was not scheduled until November 30 because Latessa was serving as presiding judge when the meeting was scheduled and it would have been difficult to replace him on short notice. Latessa does not offer any evidence to the contrary.

On November 22, 1993, Latessa was called to testify at a hearing in the Office of Administrative Law in the case of Jordan Rubin, a trainer suspended by Latessa's panel for two years. When asked about the severe penalty, Latessa testified that the decision to impose a two-year penalty was made at the direction of the Commission. When asked if he felt free to impose a different penalty, Latessa said "No."

On November 23, 1993, Zanzuccki sent Lalomia a confidential memorandum stating that he intended to notify Latessa on November 30 that he would not be offered employment with the Commission in 1994. Zanzuccki stated that the memorandum contained several attachments that demonstrate "the type of problems" that led Zanzuccki to decide not to offer Latessa employment for the upcoming year. The memorandum specifically refers to "the untruthfulness of [Latessa]." The memorandum does not mention Latessa's November 22 testimony before the OAL.

On November 30, 1993, Zanzuccki advised Latessa that Latessa would not be offered employment with the Commission in 1994. In December 1993, the Commission voted not to reappoint Latessa as presiding judge.

II.

I agree with the majority that the district court properly dismissed Latessa's Fourteenth Amendment liberty claim.

18

Latessa has failed to demonstrate that he was deprived of a liberty interest sufficient to enable him to invoke procedural due process protection. While the Constitution may recognize a liberty interest in employment, the Constitution only protects that interest from state actions that threaten to deprive persons of the right to pursue their chosen occupation. Piecknick v. Commonwealth of Pa., 36 F.3d 1250, 1259-60 (3d Cir. 1994). State actions that exclude a person from one particular job are not actionable in suits brought directly under the due process clause. Id. "It stretches the concept too far to suggest that a person is deprived of `liberty' when he simply is not rehired in one job but remains as free as before to seek another." Board of Regents v. Roth, 408 U.S. 564, 575 (1972).

Latessa never applied for a position with the Commission after he was not reappointed. In addition, Latessa worked as a racing judge in Maryland subsequent to not being reappointed in New Jersey. Latessa decided not to remain in Maryland, however, and he rejected other potential job offers as well. Thus, the Commission did not deprive Latessa of the right to work in his chosen occupation; Latessa did.

A plaintiff cannot assert a liberty interest where none exists merely by limiting his chosen occupation to the point where "occupation" becomes synonymous with "job." By unnecessarily limiting his "chosen occupation" to "presiding racing judge in New Jersey employed by the Commission," Latessa asks us to find a liberty interest in a job. We should not do so.

Latessa's Fourteenth Amendment property interest argument is equally without merit. To succeed on this claim, Latessa must show that he has a property interest in the position of presiding judge. To have a property interest in a job, "a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Roth, 408 U.S. at 577; Carter v. City of Phila., 989 F.2d 117, 120 (3d Cir. 1993) ("One alleging a property interest in a benefit protected by due process must go beyond showing an unsubstantiated expectation of the benefit.").

19

A person's interest in a job is a "property" interest for due process purposes if there are "mutually explicit understandings" that support his claim of entitlement to the job. Perry v. Sindermann, 408 U.S. 593, 601 (1972); Carter, 989 F.2d at 120. Unilateral expectations of a plaintiff are not sufficient to create a property interest.

Latessa contends that there was a mutually explicit understanding between the Commission and the judges that absent just cause for non-reappointment, the judges would always be reappointed. By statute, however, Latessa is an at-will employee who is appointed on a meet-by-meet basis and who serves at the pleasure of the Commission. N.J. Stat. Ann. § 5:5-37(a). While a statute can, in some cases, create a property interest in a job, the statute here expressly precludes such a property interest. Any property interest Latessa arguably may have had in his position lasted no longer than the length of one meet. To the extent that Latessa held an expectation of being continuously reappointed to the position of presiding judge, that expectation was unilateral and is not sufficient to support a property interest for due process purposes.

III.

Latessa also alleged that the Commission failed to reappoint Latessa due to the exercise of Latessa's free speech rights. Latessa contends that he was not reappointed because on November 22, 1993, he testified about Zanzuccki's influence in the penalty phase of the judges' deliberations.

As the majority recognizes, a public employee's claim of retaliation for engaging in a protected activity is analyzed under a three-step process. Green v. Philadelphia Hous. Auth., 105 F.2d 882, 885 (3d Cir. 1997). First, Latessa must show that the activity in question was protected. Id. If Latessa shows the activity was protected, he must then show that the activity was a motivating factor in the Commission's decision. Id. Finally, if he meets these burdens, the Commission has an opportunity to defeat his claim by demonstrating that it would have taken the same action even in the absence of the protected activity. Id.

20

Assuming that Latessa's testimony constituted protected activity, I agree with the district court that Latessa cannot show that the testimony was a motivating factor in his failure to be reappointed. The evidence of record demonstrates without contradiction that the Commission decided not to reappoint Latessa no later than early November--before Latessa testified. It is undisputed, for example, that the Commission interviewed Latessa's replacement prior to November 22, 1993. Zanzuccki testified without contradiction that prior to November 22, he decided not to reappoint Latessa, but that he decided to wait until November 30 to notify Latessa because of an ongoing meet. A letter dated November 16, 1993, confirms that prior to the testimony, Zanzuccki scheduled a meeting with Latessa. Latessa does not offer any evidence linking the reappointment decision to the November 22 testimony.

In addition, the Commission has explained that it decided not to reappoint Latessa because Latessa failed to properly communicate to Zanzuccki his position on the penalty deliberations in the Milici case. The record supports the Commission's position that Latessa's communications regarding the Milici incident were inconsistent. Zanzuccki's November 23 letter confirms that Zanzuccki was concerned about Latessa's honesty, not about the November 22 hearing. Latessa does not offer any evidence from which a finder of fact could determine that the Commission's reasons for failing to reappoint him were pretextual.

Because I believe that Latessa cannot satisfy the second prong of our First Amendment analysis, I agree with the district court that the Commission was entitled to summary judgment on Latessa's First Amendment claim. The majority concludes, however, that the issue of whether Latessa was not reappointed in retaliation for his testimony cannot be resolved as a matter of law. The majority makes three arguments in support of its position.

First, the majority observes that Latessa testified one day before Zanzuccki sent the memorandum indicating that Latessa should not be reappointed. While it is true that Latessa was not notified of his non-reappointment until shortly after his testimony before the OAL, uncontradicted evidence demonstrates that the decision not to reappoint

21

Latessa was made prior to the testimony. In addition, the memorandum at issue makes no mention of the testimony; instead, it explains that Zanzuccki was concerned about Latessa's honesty. There is no indication that the decision not to reappoint Latessa was made after the testimony.

Even if the decision to not reappoint Latessa was made the day after Latessa testified, however, we have held that "timing alone will not suffice to prove retaliatory motive." Delli Santi v. CNA Ins. Cos., 88 F.3d 192, 199 n.10 (3d Cir. 1996); see also Quiroga v. Hasbro, Inc., 934 F.2d 497, 501 (3d Cir. 1991). While timing may be used to establish a causal link between protected activity and a subsequent employment action, see Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989), it may not, without more, establish retaliatory motive.

Second, the majority observes that there is no evidence that the Commission decided to hire Corley prior to Latessa's testimony. This observation, while true, is not relevant. Even if we assume that the decision to hire Corley was made after Latessa's testimony (and the evidence in this regard is inconclusive), the decision to interview Corley was made weeks before the testimony. The timing of the interview demonstrates that the Commission desired to replace Latessa prior to the testimony.

Finally, the majority asserts that a trier of fact "might" view Zanzuccki's explanation as mere pretext. As noted, Zanzuccki testified that he was concerned about Latessa's honesty. Given Latessa's inconsistent statements regarding the Milici matter, this concern was eminently reasonable. The majority reasons, however, that "there may have been no `lie' in the sense of a knowingly false statement, and a trier of fact might conclude that Mr. Zanzuccki perceived just that and fired Mr. Latessa for the protected speech before the Office of Administrative Law." Maj. Op., at 12.

While I take issue with the majority's premise that there may not have been a "lie" (the record clearly establishes that Latessa made inconsistent statements about the Milici matter), I am more concerned about the majority's decision to permit a case to be tried on nothing more than speculation. In Sheridan v. E.I. DuPont de Nemours & Co.,

22

100 F.3d 1061 (3d Cir. 1996) (en banc), we recognized that a plaintiff may survive summary judgment in a pretext case "if the plaintiff produce[s] sufficient evidence to raise a genuine issue of fact as to whether the employer's proffered reasons were not its true reasons for the challenged employment action." Id. at 1067 (emphasis supplied); see also id. at 1072 (plaintiff must introduce "evidence that undermines the employer's proffered reasons for its actions").[1]

When faced with a motion for judgment as a matter of law, the court must determine "whether the plaintiff has cast sufficient doubt upon the employer's proffered reasons to permit a reasonable factfinder to conclude that the reasons are incredible . . . ." Id. at 1072. In this case, Latessa has not offered any evidence whatsoever to support his claim that the Commission's explanation for its reappointment decision was a pretext for retaliation. The Commission's explanation for its decision was credible and remains unchallenged. The majority does not offer any evidence to support its conclusion that the trier of fact "might" view the Commission's explanation as a pretext for retaliation.

Our precedent requires more than a mere possibility that a trier of fact might disbelieve an employer's explanation for its employment decision; it requires that the plaintiff offer some evidence that would support the trier of fact's disbelief.[2] This is ordinarily done by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherences, or

_____

1. While Sheridan involved a retaliation claim brought under Title VII, the determination of whether First Amendment protected activity was a motivating factor in the alleged retaliatory action may follow Title VII pretext analysis. See, e.g., Azzaro v. County of Allegheny, No. 95-3253, 1997 WL 170285, at *7, *14 (3d Cir. April 9, 1997) (en banc); Maj. Op., at 11-12.

2. Cf. Azzaro v. County of Allegheny, No. 95-3253, 1997 WL 170285, at *7 (3d Cir. April 9, 1997) (en banc) (emphasis supplied) ("Azzaro tendered evidence from which it could be inferred that the reason given by Braun for her discharge was pretextual . . . ."); id. at *14 (emphasis supplied) ("Based on the evidence . . . we also conclude that there is a material dispute of fact as to whether her reports were a motivating factor in the discharge decision.")

23

contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them `unworthy of credence.' " Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994) (emphasis omitted) (quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1993)). The Commission's explanation does not suffer from any of these defects.

Under the majority's reasoning, if an employee who engages in protected activity subsequently suffers an adverse employment action, the employer cannot obtain summary judgment on the employee's retaliation claim so long as its explanation "might" be disbelieved--even if there is nothing to support such disbelief. Under our precedent, the plaintiff has the burden to demonstrate that the employer's explanation for its action is a pretext for retaliation. The majority turns this precedent on its head, requiring the employer to prove that its explanation is worthy of belief.

I agree with the district court that Latessa failed to offer any evidence that would permit a trier of fact to disbelieve the Commission's explanation for its reappointment decision. I would therefore affirm the judgment of the district court dismissing Latessa's First Amendment claim.3

_____

3. I would affirm the district court's grant of the Commission's motion for summary judgment on Latessa's claim for retaliation brought under the New Jersey "Conscientious Employee Protection Act," N.J. Stat. Ann. § 34:19-1 et seq., for the same reason I would affirm the judgment of the district court in dismissing Latessa's First Amendment claim. CEPA was designed to prohibit retaliatory activity by an employer against an employee who discloses or threatens to disclose certain illegal or unethical workplace activity. Young v. Schering Corp., 645 A.2d 1238, 1244 (N.J. Super. Ct. 1994) (citations omitted), aff'd, 660 A.2d 1153 (N.J. 1995). To succeed on his CEPA claim, Latessa must show that he was not reappointed due to his testimony before the OAL. As discussed, I believe that nothing in the record would support such a finding.

I would also affirm the district court's refusal to permit Latessa to amend his complaint to include claims under the "Discipline" Operating Procedures of the New Jersey Department of Law and Public Safety as well as the whistleblower provisions of N.J. Admin. Code tit. 4A, § 2-5.1(a). The district court may decline to exercise supplemental

24

Accordingly, I respectfully dissent in part.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

_____

jurisdiction over a claim if the district court has dismissed all claims over which it has original jurisdiction. 28 U.S.C.§ 1367(c)(3); Pennsylvania Nurses Assoc. v. Pennsylvania State Educ. Assoc., 90 F.3d 797, 801 (3d Cir. 1996). After properly dismissing every count of Latessa's complaint, the district court was under no obligation to accept jurisdiction over two new state-law claims. Given the majority's reinstatement of some of Latessa's federal law claims, however, I concur that the district court should now revisit these state law claims.

Finally, I agree with the majority that Latessa's failure to pursue a common law wrongful discharge claim before the district court precludes him from pursuing such a claim on remand. Maj. Op., at 3 n.1.

25