Francis Edward SHOVLIN,
D.D.S., M.S., Plaintiff,

v.

UNIVERSITY OF MEDICINE AND
DENTISTRY OF NEW JERSEY,
(UMDNJ), a body corporate and poli-
tic of the State of New Jersey, Stanley
Bergen, in his individual capacity and
as President of UMDNJ, Paul Larson,
in his individual capacity and as Sen-
ior Vice President for Academic Af-
fairs, Karen Putterman, in her indi-
vidual capacity and as Associate Vice
President for Academic Affairs.
Richard Buchanan, in his individual
capacity and as Dean of the New Jer-
sey Dental School, Frank A. Catala-
notto, in his individual capacity and
as Associate Dean of Research for
NJDS, Julie Kligerman, in her individ-
ual capacity and as Staff Attorney,
UMDNJ, Defendants.

No. CIV. 97–634(DRD).

United States District Court,
D. New Jersey.

April 3, 1998.

Catherine Shovlin, Tucson, AZ, Thomas W. Randall, Randall, Randall & Stevens, Westwood, NJ, for Plaintiff.

Peter Verniero, Attorney General of New Jersey by Michael J. Gonnella, Deputy Attorney General, Jeffrey C. Burnstein, Deputy Attorney General, Beatriz Valera–Schutz, Deputy Attorney General, R.J.

Hughes Justice Complex, Trenton, NJ, for Defendants University of Medicine and Dentistry of New Jersey, Stanley Bergen, Karen Putterman, Richard Buchanan, Frank A. Catalanotto and Julie Kligerman.

Carl Greenberg, Budd, Larner, Gross, Rosenbaum, Greenberg & Sade, Short Hills, NJ, for Defendant Paul Larson.

## OPINION

DEBEVOISE, Senior District Judge.

Plaintiff Francis Edward Shovlin, D.D.S., M.S. ("plaintiff"), brought this action alleging, *inter alia,* that defendants violated his rights guaranteed under the First and Fourteenth Amendments to the United States Constitution in violation of 42 U.S.C. § 1983. Plaintiff also alleges defendants conspired to violate his constitutional rights.

Now before the Court are defendants' motion for summary judgment and plaintiff's motion for partial summary judgment. For the reasons that follow, plaintiff's motion will be denied, defendants' motion will be granted and this action will be dismissed in its entirety.

## BACKGROUND

Plaintiff was a tenured professor at the New Jersey Dental School ("NJDS") of the University of Medicine and Dentistry of New Jersey ("UMDNJ"). Plaintiff retired from this position in July 1994, following almost 33 years of employment with NJDS.[1] In May 1995, he was denied appointment as Professor Emeritus. In June 1995, plaintiff was notified that his appointment as an adjunct professor was not going to be renewed. Additionally, in February 1995 his request for laboratory space was denied and in May 1996 his offer to volunteer in the Research Center

was rejected. Plaintiff alleges that the foregoing actions were in retaliation for his criticisms of the NJDS administration.

Plaintiff spoke-out against the administration of NJDS on numerous occasions between 1992 and 1995. Specifically, he voiced his opinion on issues pertaining to the Dental Research Center ("DRC") and the Special Services Clinic ("SSC") at NJDS, and in the course of scientific misconduct proceedings initiated at UMDNJ. He maintains these issues were of public concern.

In November 1985, plaintiff in conjunction with Dr. Leroy Parker, the former Dean of NJDS, established the DRC at NJDS. The DRC was started in order to attract federal and state research grants and enhance the dental school's reputation for research. After a national search, Dr. Bronislaw Slomiany ("B.Slomiany") was selected to head the DRC. B. Slomiany came to the DRC as a part of a joint research team with his wife, Dr. Amalia Slomiany ("A.Slomiany").

At the time of B. Slomiany's hiring there was the execution of a March 3, 1988 "Memorandum of Understanding." The Memorandum of Understanding set forth details concerning B. Slomiany's employment arrangement with NJDS. It provided, in relevant part:

> Faculty appointment as professor at UMDNJ/NJDS is effective December 15, 1987, and will continue until retirement, dismissal for cause or financial exigency as set forth in the UMDNJ Bylaws. The administrative appointment of Faculty as Director of Research is effective May 1, 1988. Such appointment shall be at the pleasure of the Dean of UMDNJ/NJDS and the

---

1. Plaintiff commenced employment with UMDNJ on July 1, 1961 as an instructor in Oral Microbiology and Endodontics at NJDS. Thereafter, plaintiff received appointments as an assistant clinical professor and as an associate professor. He became a full professor of Endodontics and Oral Biology in 1972. During his time at NJDS plaintiff held, in addition to his faculty appointments, administrative appointments as Chairman of Endodontics from August 1972 to July 1984, Associate Dean for Research and Academic/Industrial Relations from 1984 to 1989, and Director of Environmental Safety from May 1989 until his retirement in July 1994. During the time period relevant to this case, plaintiff served as Secretary to the Academic Assembly.

UMDNJ Board of Trustees. · Faculty will be responsible directly to the NJDS Dean in his capacity as the Director of Research.

(Defendants' Aff., IA at 27). The Memorandum of Understanding was signed by Dr. Dominick P. DePaola ("DePaola"), who had replaced Parker as Dean of NJDS, and was accepted by B. Slomiany on March 5, 1988.

In 1989 and 1990, there were various changes in the NJDS administration. Defendant Dr. Frank Catalanotto ("Catalanotto") came with DePaola, to the dental school. He was appointed Associate Dean of Academic Planning and Faculty Development. Defendant Dr. Richard Buchanan ("Buchanan") was appointed Executive Associate Dean under DePaola. Following DePaola's departure, Buchanan was appointed Dean of NJDS.[2] At about that time, defendant Dr. Paul Larson ("Larson") became Senior Vice President for Academic Affairs at UMDNJ.[3] Catalanotto was appointed Associate Dean for Research under Buchanan. Plaintiff became Director of Environmental Safety.[4]

Plaintiff maintains that in 1992 Buchanan, Catalanotto and Larson commenced efforts to gain control over the DRC. Specifically, plaintiff notes that he expressed his concern over a new policy which permitted consultants and administrative liaisons appointed by the Dean to vote on items before the Research Committee. He believed that this policy gave the administration power over the Research Committee, while the NJDS Bylaws provided for faculty input on research matters. Plaintiff sought and obtained an opinion from the Bylaws and Election Committee concerning the propriety of this practice. The Bylaws and Election Committee determined that only those individuals appointed to the Research Committee by the Committee on Committees of the Academic Assembly could vote. Therefore, the members appointed solely by the Dean could not vote on issues before the Research Committee. (See Plaintiff's Ex. 25, Shovlin Aff. at ¶ 23).

In March 1993, Catalanotto submitted a proposal entitled "Proposed Guidelines for the Implementation, Management and Assessment of Specialized Centers at NJDS" to the Research Committee for comment. The proposal caused plaintiff concern because while it called for an evaluation of "Centers", plaintiff believed it was solely directed at B. Slomiany and the DRC. Plaintiff thought that the proposal conflicted with the Memorandum of Understanding between B. Slomiany and UMDNJ which provided for the administrative and fiscal management of the DRC. (Id. at ¶¶ 25–27). He raised his concerns regarding the proposal in a critique which he sent to Dean Buchanan. Plaintiff also sent copies to Catalanotto and to the members of the Research Committee, the DRC and the Committee on Committees. (Id. at ¶ 28). He asserted that the proposed guidelines removed fiscal and organizational control from the DRC's Director, while allowing those who were less qualified to guide and direct the center. Plaintiff expressed his opinion that the proposal was not in the best interests of NJDS. (Id. at ¶¶ 29–31).

The Research Committee tabled the proposal. Thereafter, Catalanotto distributed a second draft of the proposal among the members of the Research Committee. Plaintiff sent a memo to Catalanotto stating that the circulation of the second draft of the proposal "may have been inappro-

---

2. It is apparent that there is some disagreement as to the exact times that the changes in the administration took place. For instance, plaintiff asserts that Buchanan began his tenure as Dean of NJDS in 1991, while defendants assert that Buchanan succeeded DePaola in 1989.

3. As Senior Vice President for Academic Affairs, Larson was UMDNJ's chief academic officer. He had oversight over all the schools within the UMDNJ system, their academic programs and student services.

4. Defendants maintain that plaintiff's position as Associate Dean for Research and Academic Affairs was eliminated and plaintiff was replaced by Catalanotto, who was given a different title. Meanwhile, plaintiff asserts that he resigned and then Catalanotto replaced him.

priate" since the Research Committee had raised a legitimate concern in tabling the proposal until additional information could be compiled to assess the different centers within the dental school. (Plaintiff's Ex. 3 at 2). In the end, the Research Committee never considered the proposal.

Also in April 1993, plaintiff corresponded with Dean Buchanan expressing concerns with regard to an ad hoc committee that Buchanan had formed to evaluate Dr. Talib Najjar's ("Najjar") performance as Director of the SSC.[5] In an April 5, 1995 letter to Buchanan, plaintiff expressed his concern over the immediacy and timing of the review of the budgetary, research and clinical aspects of the SSC. Plaintiff also expressed an interest in appointment to the reviewing committee and gave his endorsement of Najjar. (*See* Plaintiff's Ex. 4).

Plaintiff's next conflict with the administration occurred in September 1993 when Dean Buchanan removed B. Slomiany from his position as Director of the DRC. B. Slomiany refused to relinquish his position without the approval of the Board of Trustees. On September 14, 1993, plaintiff wrote to defendant Dr. Stanley S. Bergen ("Bergen"), President of UMDNJ, and denounced the action taken by Dean Buchanan. Thereafter, President Bergen met with Buchanan and B. Slomiany to discuss the matter. President Bergen wrote to plaintiff advising him that nothing at the meeting indicated that the President's office should become directly involved in the matter. The Board of Trust-

ees subsequently approved B. Slomiany's dismissal on October 14, 1993. He retained his status as a tenured professor at the school.

In or about October 1993, Buchanan and Catalanotto received information from an anonymous source concerning duplicate publication in various journals on the part of the Slomiany research group. Catalanotto referred the matter to Dr. Jeffrey Wilusz ("Wilusz"), head of the Newark Campus Committee. This committee is responsible for investigating allegations concerning violations of UMDNJ's scientific misconduct policy.[6] Plaintiff was not implicated in the anonymous charge. He, however, was a co-author of some of the articles which were ultimately called into question.

In November 1993, Wilusz convened the Newark Campus Committee (hereinafter "the Inquiry Committee") to determine if further investigation was warranted. The Inquiry Committee found that several of the articles in question may have been duplicative. As plaintiff was a contributor of some of these articles, he was named as a respondent in the investigation along with the Slomianys and the other members of their research group, including Dr. Shipra Sengupta.[7] On November 24, 1993, Wilusz issued the Inquiry Committee's report which recommended a panel investigation of the charges.

The UMDNJ policy required that the respondents be given an opportunity to respond to the inquiry. Larson requested

5. The Special Services Clinic was created to treat patients with HIV and AIDS.

6. In or about January 1991, UMDNJ adopted a "Policy on Scientific Misconduct" to implement 42 U.S.C. § 289b. The policy sets forth a procedure for investigating scientific misconduct. The procedure requires an initial inquiry by the Campus Committee into alleged scientific misconduct. It also requires notice to the individuals involved and a determination as to whether a formal investigation by an investigative panel should occur. Under these guidelines, if the Inquiry Committee determines that cause exists for an investigation, the Senior Vice President for Academic

Affairs is required to appoint members to an investigative panel. At the conclusion of its investigation, the panel is directed to prepare a final written report to the Vice President with copies to the individual or individuals against whom the allegations were made, and where appropriate, to the individual who raised the allegation to allow for review and written rebuttal.

7. According to defendants, Sengupta eventually identified herself as the author of the anonymous complaint. Meanwhile, plaintiff alleges that Catalanotto was responsible for the anonymous charge.

that Wilusz reconvene the Inquiry Committee to entertain the respondents' comments. Plaintiff submitted a document entitled "Summary of My Responses and Opinions to the Allegations of Possible Scientific Misconduct Set Forth Against Me and Coworkers by the Newark Campus Committee on the Conduct of Research" ("Summary"). (*See* Defendants' Aff., IA at 108–113; Plaintiff's Ex. 15). In the Summary, plaintiff stated that his contribution to the papers in question was limited. In addition, he lauded the work of the researchers involved in the project. Among plaintiff's statements in the Summary were the following:

> I resigned as Associate Dean for Research and Dr. Catalanotto moved into my position ... Dr. Buchanan replaced Dr. DePaola as Dean and it appeared that Dr. Catalanotto was then given a free hand to harass and abuse the Research Center. (Defendant's Aff., IA at 111).

> ... The administration [of NJDS] was unable to get faculty support in the Research Committee to set-up a bogus evaluation of the Research Center's director, so it seeks an identical outcome through a different pathway. That is, to break the tenure of Drs. B. Slomiany and A. Slomiany and to justify their firing by the dental school administration. (*Id.* at 113).

> It is my fervent belief that the allegations described by your committee are without merit and they were contrived to discredit Dr. B. Slomiany and members of the Research Center for personal gratification and gain. (*Id.*).

On November 15, 1993, Dr. Vogel, who had been appointed as Acting Director of the DRC by Dean Buchanan, withdrew $70,000 from A. Slomiany's discretionary account despite her objections. A grievance was filed on December 14, 1993 with the Faculty Affairs Committee ("FAC"), which is charged under the NJDS Bylaws for hearing such complaints.

In January 1994, plaintiff testified before the FAC on behalf of A. Slomiany. Plaintiff again denounced what he described as the administration's attempt to gain control over the funding for the DRC. He asserted that the formula for the distribution of indirect grant costs contained in the Memorandum of Understanding required that A. Slomiany be in control of the funds and that Vogel's conduct violated that agreement. Despite contrary testimony from Catalanotto and Buchanan, the FAC agreed with plaintiff's position. Thereafter, the matter went before an AAUP arbitrator. Plaintiff again testified and the arbitrator followed his formula for distribution of the government grants.

On January 5, 1994, plaintiff testified before the Inquiry Committee reviewing the charges of scientific misconduct. Plaintiff had to lodge a complaint with the Office of Research ("ORI"), the federal agency with oversight of scientific misconduct investigations involving federal grants, before being given the opportunity to appear before the Inquiry Committee. In his letter to the ORI, plaintiff asserted that the administration was failing to follow the federal and/or University policies for such investigations and that the allegations of scientific misconduct were brought in bad faith.

Plaintiff testified before the Inquiry Committee about his contributions to the papers which were alleged to be duplicative. He also testified that he believed the charges were brought in bad faith to discredit the Slomianys for the personal gratification and gain of the dental school administration. In addition, he stated that he suspected that Catalanotto was responsible for the charges and complained about the investigation process. His testimony was consistent with the Summary submitted in response to the initial allegations.

During the pendency of the scientific misconduct proceedings, plaintiff was under review for an Emeritus appointment.[8] On or about February 2, 1994,

---

**8.** The Bylaws entitle one with Emeritus appointment "to attend without vote, meetings of the faculty, to march in a position of honor in academic processions, to receive official university mailings, and to avail [himself] of

plaintiff wrote to Dr. Joseph E. Skribner ("Skribner"), Chair of the Department on Endodontics, requesting Skribner's recommendation and support for plaintiff's appointment as Professor Emeritus upon his retirement which was scheduled for July 1, 1994. On or about February 3, 1994, Skribner wrote to Buchanan recommending plaintiff's Emeritus appointment.[9] The Appointments and Promotions Committee of the NJDS faculty also endorsed the appointment. Dean Buchanan forwarded the recommendation to the appropriate office.[10]

On February 3, 1994, the same day that Skribner recommended plaintiff's Emeritus appointment, the Inquiry Committee issued a second report regarding the scientific misconduct investigation. The Inquiry Committee again recommended that a panel investigation into the charges. On or about February 4, 1994, Catalanotto wrote to Wilusz concerning the statements made by plaintiff and the motives plaintiff attributed Buchanan, DePaola and Catalanotto. He stated that the majority of plaintiff's statements were inaccurate. Catalanotto also reminded Wilusz that plaintiff was not involved in the original allegations which he referred to the Inquiry Committee and noted that despite their disagreements, he could not imagine that plaintiff was a part of any misconduct.

Pursuant to the Committee's request, Larson appointed an investigatory panel (the "Panel"). Plaintiff objected to two of the three members on the Panel and Larson replaced them. Defendants Dr. Karen Putterman ("Putterman"), Associate Vice President for Academic Affairs, and Julie Kligerman, Esq. ("Kligerman"), Director of Legal Management, served as staff to the Panel. They provided information and legal counsel. The Panel's investigation continued from March 1994 to November 1994.[11] On or about June 2, 1994, plaintiff testified before the Panel. His testimony was consistent with the testimony he gave before the Inquiry Committee.

Prior to the Board meeting in May 1994 at which plaintiff's Emeritus appointment was to be considered, Larson asked Buchanan to prepare to discuss the appointment. By memorandum dated May 17, 1994, Dean Buchanan, in response to Larson's request, provided a summary of the considerations he felt were relevant to plaintiff's eligibility for Emeritus status. Buchanan had requested and obtained information from Catalanotto in preparing the memorandum.

Before the Board meeting, Vivian Sanks King, Esq., Vice President in charge of Legal Management, advised Larson to withdraw Skribner's recommendation from consideration because plaintiff was

---

the library and other facilities offered to University faculty members, to represent the University on appointment at academic ceremonies of other institutions, and in general to take part with the faculties in all social and ceremonial functions of the University ..." (Bylaws, Art. V., Title F, Section 1.5)

9. The Bylaws provide that Emeritus status may be conferred by the Board of Trustees upon recommendation of the President, the appropriate unit (i.e. Chair of the department), Dean and faculty (the Appointments and Promotions Committee).

10. The Bylaws do not provide for a specific procedure to be followed regarding the award of Emeritus status. The general practice, however, is to follow the provisions for full academic rank promotions. Under this procedure, the process begins with a recommendation from the department chair. That rec-

ommendation goes to a faculty committee of the particular school for consideration. The recommendation then goes to the Dean of the particular school for review and thereafter, is forwarded to the Office of Academic Administration where it is reviewed by the Vice President. If the faculty committee makes a positive recommendation, then the matter must go before the Personnel Policy Committee ("PPC") of the Board, and the Board itself if not supported by the Dean or Vice President. The recommendation is discussed and reviewed by the PPC. The matter goes before the Board for final consideration regardless of the PPC's recommendation and despite any intervening negative recommendations.

11. During this period, plaintiff retired on July 1, 1994 as expected.

involved in the scientific misconduct investigation of which the outcome was still uncertain. The recommendation was withdrawn and no action was taken at the May 1994 Board Meeting.

By letter of August 1, 1994, plaintiff wrote to President Bergen complaining of, among other things: (1) the withholding of his Emeritus appointment; (2) the loss of his office, laboratory and equipment upon his retirement; and (3) Buchanan's challenge to plaintiff's service as Secretary of the Academic Assembly because plaintiff was no longer a member of the faculty. Plaintiff also stated his reasons for not being convinced that the withholding of his Emeritus appointment was "prudent or even lawful." (Defendants' Aff., IB at 151–153). Bergen informed plaintiff that while he appreciated his years of service to UMDNJ, he was unable to interfere with the process by which Emeritus decisions are made.

Following the conclusion of the Panel's hearing regarding the allegations of scientific misconduct, plaintiff submitted a "Response to the Investigative Committee's Request for Opinions by Respondents at the Hearing Conclusion." (*See* Defendants' Aff., IB at 156–166; Plaintiff's Ex. 15). Among his statements were the following:

> ... many faculty members asked me if they could help in any way. I refused any assistance because of my belief that the dental school administration, in particular the Associate Dean for Research [Catalanotto], might seek retribution against them. I say this because I have had personal experience with his vindictiveness when someone disagrees with him. (Defendant's Aff., IB at 163).
>
> ... if you do not accommodate the Associate Dean for Research you suffer the consequences ... It is my opinion that recognition as Emeritus Professor was withheld to intimidate me with respect to this hearing. (*Id.* at 164).
>
> ... We have the most vindictive and inept administration in the history of the dental school but no one has interfered. (*Id.* at 166).

On or about November 21, 1994, the Panel submitted its report and recommendations concerning the scientific misconduct investigation to Larson. The report contained the following findings and recommendation pertaining to plaintiff:

> The Panel finds that [plaintiff] was only very peripherally involved in the issues raised in the complaint and in the subsequent hearings. The Panel also finds that [plaintiff] had no involvement in any wrongdoing and, therefore, the Investigatory Panel recommends that no sanctions be taken against [plaintiff]. (Defendant's Aff., IA at 130).

On or about January 23, 1995, Larson submitted his report. Larson advised that he would take the following actions based on the Panel's investigation:

> 1. A letter will be sent to each author of the pairs of publications in which duplication of reporting of research results occurred, explaining that this practice is considered counterproductive and improper by both the scientific community and by the University.
>
> 2. Letters to the editor of each of the journals in which the duplicated papers were published will be sent enclosing the publications in question for the editors' review and for any action they deem appropriate.
>
> 3. All future abstracts, manuscripts and grant proposals of all respondents must be reviewed by a departmental chair or a dean prior to submission for a period of three years to ensure that duplication of publication no longer occurs, except where appropriate (as for example on those occasions identified by the International Committee of Medical Journal Editors).

(Defendant's Aff., IB at 169). Larson also stated that he would issue a letter regarding retention of research data and, as recommended by the Panel, letters of reprimand would be sent to the Slomianys and

another of the named respondents, Dr. Piotrowski. He made no mention of plaintiff in his report which refers only to the "Slomiany group". Copies of Larson's report were sent to all the respondents.[12]

By letter dated March 11, 1995, plaintiff advised President Bergen that errors of fact had been made in the scientific misconduct hearing. He also expressed his concern over the fact that Larson's report failed to mention that the Panel "specifically stated that [plaintiff] was absolved of any wrong doing." (*Id.* at 181). In addition, he complained of the unavailability of an internal mechanism for the respondents to appeal and noted that the appeal before the Appellate Division did not include him since he did not have "an unsettled disagreement with the University." (*Id.*). Plaintiff also expressed concern regarding his Emeritus appointment and need for research space.[13]

President Bergen responded to plaintiff's letter on March 17, 1995. He indicated that he had briefly discussed the possibility of plaintiff's Emeritus appointment with Larson. Bergen noted that Larson had informed him that there was insufficient support for the appointment from NJDS and therefore, he was reviewing other possibilities at that time.[14] (*See Id.* at 183).

On April 24, 1995, the aforementioned "Letters of Reprimand" were forwarded to the Slomianys and Dr. Piotrowski. In addition, two memoranda of the same date were forwarded to Dean Buchanan. One was entitled "Corrective Action Regarding the Finding of Duplicative Publication—Investigation into Allegations of Misconduct in Science Against: Dr. Amalia Slomiany[,] Dr. Bronslaw L. Slomiany[,] Dr. Jerzy Piotrowski[,] Dr. V.L.N. Murty[,] Dr. Shipra Sengupta[,] *Dr. Frances Shovlin* [and] Mrs. Elizabeth Piotrowski." (*Id.* at 189)(emphasis added). Larson recommended the following corrective action:

For a period of three years commencing the date of this memo, all abstract, manuscripts, and grant proposals written by these individuals must be reviewed by a departmental chair or a dean prior to submission to ensure that duplication of publication no longer occurs except where appropriate, as for example on those occasions identified by the International Committee of Medical Journal Editors, copy enclosed, or where repeated publication of a set of results contains proper citation of the other publication(s).

(*Id.*).

The other memorandum was entitled "Corrective Action Regarding Failure to Retain Original Research Data —— Investigation Into Allegations of Misconduct in Science Against: Dr. Amalia Slomiany[,] Dr. Bronislaw L. Slomiany[,] Dr. Jerzy Piotrowski[,] Dr. V.L.N. Murty[,] Dr. Shipra Sengupta [and] Ms. Elizabeth Piotrowski." (*Id.* at 191). Larson recommended the following corrective action:

For a period of three years commencing with the date of this memo, the research records and comments relating to all future abstracts, publications and grant proposals from these individuals must be reviewed by a departmental chair or a dean subsequent to submission to ensure that original research data are being retained for no less than five years after termination of the grant under which the research was performed or after the publication of the research results, whichever is later, and preferably indefinitely.

(*Id.*).

Also on April 24, 1995, plaintiff received two letters of that same date from Larson. (*See Id.* at 192–200). Copies of the letters were forwarded to President Bergen, Dean Buchanan, Vogel and Dr. John W. Krueg-

---

12. On or about January 31, 1995, the Slomianys filed a Notice of Appeal with the Appellate Division Superior Court of New Jersey. They withdrew their appeal on April 17, 1995.

13. Plaintiff had previously raised these concerns in an August 1, 1994 letter to Bergen.

14. Also in March 1995, Catalanotto resigned from his position at UMDNJ.

er, of the ORI. One of the letters, which referenced "Papers 6A/6B", addressed the duplication of publication findings. It stated, in part:

> An investigation into allegations of misconduct in science against you and several other members of your research laboratory was conducted by the University ... the Panel found in its final report that duplication of publication occurred several times among the nine sets of published papers it considered, and that this practice seriously deviated from what is generally accepted as appropriate ... I concurred with the Panel's finding in this regard, considered the Panel's recommendations, and determined the following corrective actions ... you should avoid redundant publication of your research if it has already been reported in a published article or is contained in another article that has been submitted or accepted for publication elsewhere ... In addition, all your future abstracts, manuscripts and grant proposals must be reviewed by a departmental chair or dean prior to submission for a period of three years from the date of this letter to ensure that inappropriate duplication of publication ceases. You will be informed shortly of the procedure to be followed in this regard.

(*Id.* at 192–93). The other letter to plaintiff focused on the destruction of raw data. It stated, in relevant part:

> ... I concurred with the Panel that hasty destruction of original research data prevents the defense of published research and is a very serious and intolerable deviation from accepted practice. Absence of original data may create the presumption of misconduct or of questionable research practices ... In this very case, this practice prevented the University from determining the integrity of the research you conducted and reported ... Consistent with the norms of the scientific community and of the University, you are hereby required to retain raw and original research data for no less than five years after the termination of the grant under which the

research was performed or after the publication of the research results, whichever is later and preferably indefinitely. I expect that your research practice in the future will adhere to this requirement. In addition, your research records and documents relating to all your future abstracts, manuscripts and grant proposals must be reviewed by a departmental chair or a dean subsequent to submission for a period of three years in order to ensure that data are being retained ...

(*Id.* at 197–98).

On May 9, 1995, the Board, at its regularly scheduled monthly meeting, considered Skribner's recommendation of plaintiff for Emeritus status. Prior to the Board's meeting, Dean Buchanan addressed the PPC. He commented on his written evaluation of plaintiff and the specific items listed in the 1994 memorandum he prepared at Larson's request. These items included:

1. 33 years of total service as an NJDS faculty member, including service in the following positions: a) chairman of Dept. of Endodontics, b) Assoc. Dean for Research, and c) Director of Environmental Safety, among others.

2. 18–20 publications in refereed journals, including 8 as principal author and 7 grants totaling $513,000.

3. Long term contributions to pre and post doctoral teaching programs, but no recognition of teaching effectiveness through student or faculty awards process.

4. Limited national visibility deriving from: a) participation in national professional and scientific organizations, b) service on national committees or c) recognition of contributions in research and science.

5. Limited effectiveness of some service contributions to NJDS, especially leadership of development of institutional capacity for research as Assoc. Dean for Research. Service at the University

level has included membership on 3 committees.

6. *A tendency toward anti-intellectual and anti-academic attitudes predisposes prejudicial and unbalanced positions on issues of importance to the dental school. As a result, the broader institutional welfare is not always [plaintiff's] pre-eminent priority and some of his actions have been uninformed by fact, disruptive and disturbing.*

7. *Professor Emeritus status should be based on sustained, distinctive, special contributions and performance.*

(Defendant's Aff., IA at 149)(emphasis added). Larson generally concurred with Dean Buchanan's evaluation of plaintiff. He recommended that plaintiff's appointment not be approved because of the high standards of such title.

The summary sheet offered by Skribner with his recommendation indicates that: 1) plaintiff had no current active grants; 2) his total grants in his thirty-three years at UMDNJ had been seven in the amount of $513,090; 3) the number of publications in journals as a principal author totaled eight; 4) he had published two chapters in books; and 5) he had no review articles to his credit. Skribner concluded that plaintiff "has always been a dedicated educator, administrator, alumnus and spokesman for dentistry." (*Id.* at 212). Meanwhile, plaintiff's curriculum vitae reveals that: 1) plaintiff's last award was an alumni award received in 1976; 2) from 1984 to the date of his retirement plaintiff had served as the chairman of three different committees; 3) he was a principal investigator on four grants one of which was the continuation of a prior grant; 5) the last grant on which he was the principal investigator was in 1981; 6) he was co-investigator on three grants, the last of which was in 1983; 7) he subsequently applied for, but did not receive any NIH grants; 8) the last article on which he was the principal author was published in 1982; 9) the last of the five articles on which he appeared as a co-author were produced by the Slomiany group, three in 1991 and one each in 1992 and 1993; and 10) during the last ten years of his tenure he prepared six abstracts and published none. (*Id.* at 213–226).

The PPC recommended that the Board not grant the Emeritus appointment. The Board agreed with the recommendation.[15] Larson advised plaintiff of the denial by memorandum dated May 12, 1995. As previously noted, in or about June 1995 plaintiff was advised that his at-will adjunct appointment with the school had not been renewed.

### The Complaint

Plaintiff filed this action on February 7, 1997. In the first count of the complaint he alleges that defendants violated his procedural and substantive due process rights guaranteed by the Fourteenth Amendment. (Compl. at ¶ 58). Plaintiff alleges, *inter alia*, that he "had a liberty interest in his reputation, good name, standing in the scientific community, ability to publish without restriction or oversight and the avoidance of stigma attached to a finding that he committed misconduct in science when such finding violated the UMDNJ policy." (*Id.* at ¶ 60). He also alleges that "[t]he UMDNJ policy on scientific misconduct constituted a state-created liberty interest." (*Id.* at ¶ 61). He further alleges that defendants "maliciously, intentionally and with deliberate indifference, disseminated erroneous information about the results of the misconduct hearing, thereby affecting [plaintiff's] Emeritus application, the renewal of his medical school appointment, his ability to use UMDNJ facilities and/or his ability to publish without oversight." (*Id.* at ¶ 64).

In the second count of the complaint, plaintiff alleges that defendants violated his First Amendment rights in retaliation

---

**15.** Plaintiff asserts that he is the only Professor at UMDNJ to be denied Emeritus appointment after being recommended by a department chairperson for such appointment. He also asserts that Larson never before had recommended against such an appointment.

for his protected speech on matters of public concern. (*Id.* at ¶¶ 74—83). He alleges that the constitutionally protected speech was "a substantial and/or motivational factor for the Defendants' illegal acts including, but not limited to, interfering with [his] Emeritus and medical school appointments, representing to the Board of Trustees, NIH, journals and others that he was found guilty of scientific misconduct, denying lab space or the ability to work as a volunteer to carry on research, and inducing him to accept early retirement with the expectation that he could continue his associations and involvement with NJDS." (*Id.* at ¶ 79). Plaintiff also alleges that his interests in commenting on the matters in question "did not interfere, and/or enhanced or outweighed the state's interest in maintaining efficient public services." (*Id.* at ¶ 80). Moreover, he alleges that defendants were "high ranking [ ] officials whose conduct constituted the policy and custom at UMDNJ" and that "[d]efendants acted in a conspiratorial manner to violate [his] First Amendment rights." (*Id.* at ¶¶ 82, 83).

The third count of the complaint sets forth a separate claim for conspiracy to violate plaintiff's constitutional rights. The fourth count asserts "Entity Liability." In addition to compensatory damages, plaintiff seeks, among other things, punitive damages, status as Professor Emeritus at UMDNJ, a public apology and notice to the ORI and certain scientific journals of his exoneration and removal of the misconduct letter from his file.

### The Pending Motions

Plaintiff has moved for partial summary judgment. He maintains that the record conclusively establishes that defendants violated his First Amendment rights by denying him the Emeritus appointment in retaliation for his protected speech. Meanwhile, defendants have moved for summary judgment and seek dismissal of this action in its entirety. They argue that plaintiff has alleged no act cognizable as a violation of any constitutional right. They contend that the applicable statute of limi-

tations bars claims relating to events which occurred prior to February 7, 1995. In addition, they also contend that plaintiff's conspiracy claim, entity liability claim and prayer for punitive damages are without merit and must be dismissed.

### STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *rev'g,* 723 F.2d 238 (3d Cir.1983). The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *Sound Ship Bldg. Corp. v. Bethlehem Steel Co.,* 533 F.2d 96, 99 (3d Cir.), *cert. denied,* 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976).

At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The mere existence of some alleged factual dispute between the parties, however, will not defeat an otherwise properly supported motion for summary judgment. *Id.* at 247–248, 106 S.Ct. 2505.

**310**

## ANALYSIS

### I. The Statute of Limitations

■ As an initial matter, it must be determined which, if any, of plaintiff's claims are timely. The applicable statute of limitations for a civil rights action brought under 42 U.S.C. § 1983 is that for the most analogous action under state law, which is that for a personal injury claim. *See Owens v. Okure,* 488 U.S. 235, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989); *Wilson v. Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). Under New Jersey law, a two-year statute of limitations governs personal injury claims. *N.J.S.A.* 2A:14–2. While the statute of limitations is borrowed from state law, federal law governs the accrual of federal civil rights claims. *See Genty v. Resolution Trust Corp.,* 937 F.2d 899, 919 (3d Cir.1991). A § 1983 action begins to run from the point that the plaintiff knew or should have had reason to know of the alleged injury which is the basis for that action. *Id.*

Defendants contend that the only the acts which plaintiff alleges were retaliatory (i.e. the February 1995 denial of plaintiff's request for lab space, the denial of the Emeritus status on May 9, 1995, the non-renewal of plaintiff's adjunct position in June 1995, and the rejection of his offer to volunteer at the DRC in May 1996) are actionable here. They are correct that any violations which are alleged to have occurred prior to February 7, 1995 would be time-barred. It is noted, however, that the majority of plaintiff's complaint is predicated on the alleged retaliatory actions which defendants concede are timely. In addition to these claims, there are also plaintiff's allegations concerning the deprivation of his Fourteenth Amendment rights arising from the scientific misconduct proceedings.

■ Plaintiff does not allege that his due process rights were violated during the scientific misconduct proceedings which were conducted prior to the February 7, 1995 accrual date. Rather, his complaint in this regard concerns the April 24, 1995 memorandum from Larson to Bu-

chanan, in which Larson listed plaintiff as one of the individuals against whom corrective action was going to be imposed, despite the Panel's prior finding that he was only peripherally involved in any wrongdoing. Plaintiff's action accrued from this same date, when he also received[1] the two letters from Larson notifying him of the corrective action. Prior to the issuance of these letters, plaintiff did not have reason to know that a possible violation of his constitutional rights had occurred. Thus, defendants' argument that statute of limitations bars some aspect of plaintiff's action is without merit.

### II. Plaintiff's Claim of Defendants' Retaliatory Conduct In Violation of First Amendment

■ "A public employee's claim of retaliation for engaging in a protected activity is analyzed under a three-step process." *Green v. Philadelphia Housing Authority,* 105 F.3d 882, 885 (3d Cir.) (citations omitted), *cert. denied,* —— U.S. ——, 118 S.Ct. 64, 139 L.Ed.2d 26 (1997). A plaintiff must demonstrate: (1) that the activity in question was protected; and (2) that the protected activity was a substantial or motivating factor in the alleged retaliatory action. *Id.* If plaintiff establishes these elements, then "defendants may defeat plaintiff's claim by demonstrating 'that the same action would have been taken even in the absence of the protected conduct.'" *Id.* (quoting *Swineford v. Snyder County Pa.,* 15 F.3d 1258, 1270 (3d Cir.1994)).

### A. The First Amendment's Protection of a Government Employee's Speech on a Matter of Public Concern

■■ The Supreme Court has long recognized that the expressive rights of public employees are subject to restrictions that would not be constitutionally permissible if applied to other members of society who are not in an employment relationship with the State. *See Waters v. Churchill,* 511 U.S. 661, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994); *Connick v. Myers,* 461 U.S. 138,

103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Mount Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Thus, "a discharged public employee cannot receive redress in a § 1983 action simply by showing that the same speech would be protected from government sanction were it to be engaged in by a non-employee citizen." *Azzaro v. County of Allegheny,* 110 F.3d 968, 975 (3d Cir. 1997)(en banc). However, "a public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment." *Connick,* 461 U.S. at 140, 103 S.Ct. 1684 (citing *Pickering,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811); *see also Waters,* 511 U.S. 661, 114 S.Ct. 1878, 128 L.Ed.2d 686; *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); *Azzaro,* 110 F.3d 968; *Green,* 105 F.3d 882.

"[T]o be protected the speech must be on a matter of public concern, and the employee's interest in expressing herself [or himself] on this matter must not be outweighed by any injury the speech could cause to the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Waters,* 511 U.S. at 667, 114 S.Ct. 1878 (internal quotations omitted); *see also Azzaro,* 110 F.3d at 976 ("A discharged public employee is entitled to no redress if her expression is not related to a matter of public concern or, even if it is so related, if its value is outweighed by the value of permitting the government to take action promoting efficiency and effectiveness."). Otherwise, "government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Connick,* 461 U.S. at 146, 103 S.Ct. 1684.

The threshold issue in an action where a government employee is claiming that he or she was retaliated against in violation of the First Amendment is whether that employee's speech or other form of expression is of public concern. Speech is of public concern if it can be "fairly considered as relating to any matter of political, social or other concern to the community . . ." *Id.* This determination is made by the Court based on the "content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147–48, 103 S.Ct. 1684; *see also Waters,* 511 U.S. at 667–69, 114 S.Ct. 1878; *Green,* 105 F.3d at 885–86.

Moreover, while it is not determinative, "the speaker's motivation is relevant to the extent that it indicates whether the speaker is speaking as 'a citizen upon matters of public concern' or as a volunteer 'upon matters only of personal interest.'" *Versarge v. Township of Clinton N.J.,* 984 F.2d 1359, 1365 (3d Cir.1993)(quoting *Connick,* 461 U.S. at 147, 103 S.Ct. 1684); *see also Zamboni v. Stamler,* 847 F.2d 73, 77–78 (3d Cir.), *cert. denied,* 488 U.S. 899, 109 S.Ct. 245, 102 L.Ed.2d 233 (1988). However, "the mere fact that an employee's statement is an outgrowth of his personal dispute does not prevent some aspect of it from touching upon matters of public concern." *Johnson v. Lincoln Univ.,* 776 F.2d 443, 451 (3d Cir.1985)(citing *Connick,* 461 U.S. at 153, 103 S.Ct. 1684).

1. *Plaintiff's Speech Involving Matters of Public Concern*

Plaintiff argues that his various oral and written statements criticizing the members of the NJDS administration can be fairly considered as relating to matters of political, social and/or other concern to the community. Plaintiff maintains that he was acting in accordance with his duty as a member of the Research Committee when denouncing the practice of allowing liaisons and consultants to vote on that committee, and when challenging the proposed

guidelines relating to the DRC and the removal of B. Slomiany. He asserts that he was attempting to have public officials conform their conduct to the laws governing their public duties and was not merely airing personal grievances as defendants suggest.[16]

Plaintiff also maintains that his testimony before the FAC and the AAUP Arbitrator is protected since it was given during a government sanctioned administrative hearing involving charges of official misconduct with respect to the expenditure of public funds, citing *Latessa v. New Jersey Racing Commission*, 113 F.3d 1313, 1319 (3d Cir.1997). He makes an analogous argument with respect to his testimony before the Inquiry Committee and the Panel, and also with regard to written statements made in the course of the scientific misconduct proceedings.

■ While there was an element of self-interest motivating many of plaintiff's statements concerning the NJDS administration, looking at the content, form and context of at least some of these statements, they can be fairly considered as involving matters of public concern. As a general matter, the administration and affairs of a public institution which educates and trains health professionals is of concern to the community in which that institution is located, and whose citizenry fund that institution and benefit from its services. Moreover, it has been recognized that a faculty member's criticisms concerning the policies and practices of the administration at a public institution of learning are squarely encompassed by the First Amendment. *Trotman v. Board of Trustees of Lincoln University*, 635 F.2d 216, 225 (1980)(finding that faculty members' activity which was in essence criticism of state-related university's president's policies and methods was protected activity), *cert. denied*, 451 U.S. 986, 101 S.Ct. 2320, 68 L.Ed.2d 844 (1981); *see also Johnson*, 776 F.2d at 452 (faculty members questioning of academic standards was of public concern).

Reviewing the different categories of statements at issue here, it is apparent that some relate to the administration of NJDS. First, there is plaintiff's criticism of the procedure whereby those other than members of the Research Committee were being permitted to vote on matters before said Committee. Also, there are the statements and testimony pertaining to the propriety of B. Slomiany's removal as Director of the DRC and those in opposition to the withdrawal of funds from the account of A. Slomiany. Finally, there is plaintiff's evidence presented in the course of the scientific misconduct proceeding. Plaintiff's apparent enmity for Buchanan, Catalanotto and other members of the NJDS administration does not preclude a finding that some of this evidence was of public concern. Nor is it determinative that plaintiff was politically and/or otherwise allied with the Slomiany group. Many of his statements and expressions are in the realm of public concern and therefore, may be entitled to First Amendment protection notwithstanding the per-

---

**16.** Plaintiff notes that, in establishing UMDNJ, the Legislature granted the University the power to operate medical, dental and health related programs because this is an essential government function necessary for the welfare of the people of New Jersey. To carry out its functions, UMDNJ was given a high degree of autonomy. The UMDNJ Bylaws state that it is "the policy of UMDNJ to foster and maintain full freedom of discussion, inquiry, teaching and research." UMDNJ Bylaws Art. 5, Title C. The UMDNJ Bylaws authorize each of its individual schools, including the dental school, to establish their own Bylaws. The NJDS Bylaws provide for faculty input into dental school administration through an Academic Assembly composed of all persons who hold a recognized academic rank and a faculty appointment with NJDS. NJDS Bylaws, Art. II, Title B, Sec. 1 and 2. The NJDS Bylaws also establish standing committees within the Academic Assembly, including the Research Committee, which is charged with advising the administrative officer for research on the development of research programs in the dental school and on the disbursement of research funds. UMDNJ–NJDS Procedural Code, Title VII, Sec. H.

sonal disputes and interests which in part motivated plaintiff. *Johnson*, 776 F.2d at 452.

This case presents the situation where a faculty member during continuing disagreement with his department's administration and administrators addressed matters both of public and private concern. He addressed both such concerns in a manner which the members of the administration found to be unprofessional and disruptive.

### 2. Balancing of Interests

■ Even if a State employee's speech or other expression is on a matter of public concern, it is entitled to constitutional protection only if the value of that speech or expression outweighs the value of permitting the State to take action to promote the efficient and effective fulfillment of its responsibilities to the public. *Connick*, 461 U.S. at 150, 103 S.Ct. 1684; *Azzaro*, 110 F.3d at 980; *Green*, 105 F.3d at 887–89. In making this determination, the Court must consider the value of plaintiff's speech to the public interest against the potential disruptiveness of the speech as it relates to the work of the public entity in question. *Waters*, 511 U.S. at 679–81, 114 S.Ct. 1878; *Green*, 105 F.3d at 887.

"Whether there is potential disruption is an issue of law for the court." *Green*, 105 F.3d at 889. Moreover, while this type of balancing test would ordinarily involve issues of fact which would remain in the hands of the fact finder, Supreme Court precedent dictates that the trial court make this determination even "where the presence of factual disputes would normally preclude the court from ruling as a matter of law." *Id.* at 887.

■ Here, the disruptiveness of plaintiff's criticisms of the dental school's administration was not so much a result of the subject matter of the various statements, but because of their often unsupported allegations against other faculty

members, their frequency and their form. The potential for disruption is perhaps best described by President Bergen who testified about his 27 year relationship with plaintiff as follows:

> My experience with [plaintiff] was that he did tend to grouse and complain about the leadership no matter who that leadership was in the Dental School. It was not to single out one dean versus the other, but he did rather frequently and constantly bring to me negative opinions of the administration of the Dental School through probably four or five different deans ... I would not say that in my opinion [plaintiff] was anti-intellectual or anti-academic, but I would say that he was certainly anti-authority, anti-administration no matter who it was
>
> ...

(Defendants' Aff., Vol. II, Ex. I at 49–50).

While the credibility of President Bergen could be called into questioned as he is a named defendant in this action,[17] plaintiff's own statements also reveal his overall disapproval of and hostility towards the NJDS administration. These statements were mainly directed at Buchanan and Catalanotto, whom he described as heading "the most vindictive and inept administration in the history of the dental school" and charged with not only wrongfully removing B. Slomiany in order to gain control of the funding of the DRC, but of falsifying charges of scientific misconduct to discredit the Slomiany research group.

Plaintiff's conduct towards the Inquiry Committee and the Investigatory Panel are further examples of his negative impact upon the academic community of which he was a part. When Buchanan and Catalanotto received information concerning duplicate publications they had an obligation both to the federal authorities and the University to make a thorough inquiry. Plaintiff was clearly out-of-order to attack the inquiry as a ploy by the administration

---

**17.** In fairness to this defendant, as discussed *infra,* plaintiff fails to address how Bergen violated his civil rights.

"to set-up. a bogus evaluation of the Research Center's director" and "to discredit Dr. B. Slomiany and members of the Research center for personal gratification and gain."

The Investigatory Panel conducted a thorough study. Even though the federal agency to which the university reported may not have considered duplicate publications to constitute "misconduct in science", it recognized the University's right to hold such a practice to be unacceptable. In addition to confirming the practice of duplicative publication, the Investigatory Panel ascertained that frequently the research laboratory did not preserve original research data, preventing defense of published research.

The report of the Investigatory Panel stated that plaintiff was only peripherally involved in the issues raised in the complaint, that he had no involvement in any way and that no sanctions be taken against him. The Department took steps to correct the deficiencies which it found to exist, as it was obligated to do. Plaintiff's attacks on the work of the Inquiry Committee and Investigatory Panel were inappropriate and unwarranted. The administration was entitled to take this kind of conduct into account when considering plaintiff for an appointment to an honorary position whereby he would remain at NJDS after retirement.

Despite his disruptive actions, plaintiff undeniably contributed to the administration of his department. He spoke out concerning the propriety of certain actions on the part of the NJDS administration that apparently would have gone unaddressed in his absence. It does not follow, however, that because of his positive contributions the University must ignore the disruptive practices in which he engaged.

Plaintiff challenged the administration's authority and actions in very general terms. Moreover, his contempt for Buchanan leaves little doubt that his continued presence at the dental school was likely to cause further disruption to the administration, notwithstanding the merits of some of the positions he took in the past. Therefore, assuming arguendo that it could be shown that plaintiff's speech was a substantial or motivating factor in the denial of his Emeritus status, the decision not to renew his adjunct appointment and other related actions, these actions were constitutionally permissible based on the likelihood of unjustifiable discord if plaintiff remained at NJDS.

### B. *Substantial or Motivating Factor*

It is noted that had the balance tipped in plaintiff's favor, there still remains a factual issue whether plaintiff's expressions were a substantial or motivating factor in the denial of the Emeritus appointment. Plaintiff has moved for summary judgment arguing that Buchanan has conceded that his evaluation and recommendation against the Emeritus appointment was based at least in part on plaintiff's criticism of the administration. Buchanan's deposition testimony indicates that he considered plaintiff's statements to the extent that he felt they were based on inaccurate information and were not in the best interests of the school. This is quite different from a concession that he acted to prevent the appointment merely because plaintiff had spoken out against the administration in the past.

Moreover, it has not been conclusively established what factors were considered by the PPC in making its recommendation and by the Board in making the final decision on the Emeritus appointment. In addition, it has not been shown that Buchanan's evaluation included erroneous information, nor does the record conclusively establish that Buchanan's and Larson's opposition to the appointment was tainted by retaliatory motive. Thus, even if plaintiff was entitled to First Amendment protection in this instance, factual disputes would prevent judgment in his favor at this time.[18]

---

**18.** Of course, it follows that there is an unsettled issue whether the denial would have occurred even in the absence of the protected conduct.

## III. Plaintiff's Fourteenth Amendment Claim

Defendants argue that plaintiff does not have a cognizable claim under the Fourteenth Amendment because plaintiff had only a unilateral expectation of receiving Emeritus status, laboratory space at NJDS upon his retirement and reappointment as an adjunct professor. In addition, they contend that his allegation of injury to reputation arising from the scientific misconduct proceeding is insufficient to implicate a property right or liberty interest which is protected by the Due Process Clause. They also note that while plaintiff was not found guilty of scientific misconduct, he had an available state remedy to address any grievances pertaining to the scientific misconduct proceedings.

Plaintiff opposes defendants' motion with regard to his procedural and substantive due process claims, arguing that he was found guilty of scientific misconduct by virtue of the action taken by Larson which conflicted with the Panel's findings and which was unauthorized and unwarranted. He notes that Larson imposed a requirement that his abstracts, manuscripts and grant proposals be reviewed by the administration prior to submission which restricted his right to publish. Plaintiff argues that the federal regulation and UMDNJ policy on scientific misconduct establish specific predicates which must be met before such sanctions can be imposed. He concludes that he has a property interest in being free from formal adjudication and sanction for scientific misconduct in the absence of these predicates.

Moreover, plaintiff argues that the federal regulation requires that the University undertake diligent efforts where appropriate to restore the reputations of persons alleged to have engaged in scientific misconduct when the allegations are not confirmed. He refutes defendants' contention that he had an available state remedy to seek redress for Larson's action. Plaintiff also argues that the UMDNJ policy created a liberty interest in his good reputation and that the New Jersey Constitution also provides him with such an interest.

The Fourteenth Amendment's Due Process Clause encompasses both substantive and procedural components. The Due Process Clause requires that the government follow fair and appropriate procedures when it seeks to deprive a person of life, liberty and property. The Due Process Clause also prevents certain government actions regardless of the fairness of the procedures used to implement them. *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). "[T]he substantive component of the Due Process Clause can only be violated by governmental employees when their conduct amounts to an abuse of official power that 'shocks the conscience.'" *Fagan v. City of Vineland*, 22 F.3d 1296, 1303 (3d Cir.1994)(en banc)(citing *Collins v. City of Harker Heights*, 503 U.S. 115, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)); *see also Daniels*, 474 U.S. at 331, 106 S.Ct. 662; *Giuffre v. Bissell*, 31 F.3d 1241, 1258 (3d Cir.1994). Meanwhile, "a plaintiff who wishes to sustain a § 1983 claim based upon a violation of procedural due process must, at a minimum, prove recklessness or 'gross negligence' and in some instance[s] may be required to show a 'deliberate decision to deprive' the plaintiff of due process." *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1277 (3d Cir.1994)(citing *Daniels*, 474 U.S. at 333–34, 106 S.Ct. 662). "[T]he interest of a person subject to governmental action is in the accurate determination . . . not in a result more favorable to him." *Heller v. Doe*, 509 U.S. 312, 322, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993).

Plaintiff's Fourteenth Amendment claim concerns the scientific misconduct proceedings. He does not take issue with the Panel Investigation, and with good reason. He was given notice and more than ample opportunity to respond to the charges. Moreover, his concerns regarding the composition of the Panel and the opportunity to respond were properly addressed and

the Panel's findings were in his favor. What plaintiff seeks is redress for the corrective action taken against him by Larson which followed the Panel's finding that plaintiff was only peripherally involved in the misconduct. He also predicates his due process claim on the undisputed fact that Larson notified the ORI and certain journals of plaintiff's involvement in the misconduct investigation without advising that he had been more or less exonerated by the Panel.

 As a preliminary matter, the denial of the Emeritus appointment, decision not to renew the adjunct appointment, and other related requests, do not give rise to a due process claim. Procedural due process does not extend to a prospective interest or benefit absent a "legitimate claim of entitlement" as contrasted with "an abstract need or desire" or "unilateral expectation" of receipt of said interest or benefit. *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 576, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *see also Robb v. City of Philadelphia,* 733 F.2d 286, 292 (3d Cir.1984). Upon retirement from his tenured position, plaintiff was an at-will employee of UMDNJ and thus, had only the unilateral expectation of renewal of his adjunct appointment, appointment as Professor Emeritus and the privileges that would accompany it. In the absence of a contractual or statutory entitlement, a public employee does not have a due process claim with regard to such employment decisions. *See Waters,* 511 U.S. at 679, 114 S.Ct. 1878; *Roth,* 408 U.S. at 576, 92 S.Ct. 2701; *Robertson v. Fiore,* 62 F.3d 596, 601 (3d Cir.1995); *Robb,* 733 F.2d at 292; *Ditzel v. UMDNJ,* 962 F.Supp. 595, 607 (D.N.J.1997).

 In addition, Plaintiff does not have a cognizable due process claim under § 1983 based upon the alleged damage to his reputation due to Larson's actions following the Panel's investigation. Without

showing of an accompanying deprivation, such as a subsequent denial of employment due to the alleged defamatory conduct, he lacks a claim in this regard.[19] *See Robb,* 733 F.2d at 294 ("Stigma to reputation alone, absent some accompanying deprivation of present or future employment, is not a liberty interest protected by the Fourteenth Amendment."); *see also Paul v. Davis,* 424 U.S. 693, 712, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976)(tort of defamation held to be an inadequate basis for a claim under § 1983); *Kelly v. Borough of Sayreville,* 107 F.3d 1073, 1078 (3d Cir. 1997)(state defamation claim not the equivalent of Fourteenth Amendment violation under § 1983); *Sturm v. Clark,* 835 F.2d 1009, 1012–13 (3d Cir.1987)(holding harm to reputation and financial interests insufficient to confer liberty interest).

Plaintiff argues that he has a protected interest under state law based solely on the alleged injury to his reputation. He is correct that the New Jersey Constitution protects reputation. *See Doe v. Poritz,* 142 N.J. 1, 662 A.2d 367 (1995). The New Jersey Supreme Court recently stated:

> Under the State Constitution, we find *protectible interests in both privacy and reputation.* Our analysis differs from that under the Federal Constitution only to the extent that *we find a protectible interest in reputation without requiring any other tangible loss.* In interpreting the State Constitution, we look to both the federal courts and other state courts for assistance ... but the ultimate responsibility for interpreting the New Jersey Constitution is ours. In fulfilling that responsibility, we have generally been more willing to find State-created interests that invoke the protection of procedural due process than have our counterparts.

*Id.* at 104, 662 A.2d 367 (citations omitted)(emphasis added).

---

19. The record does not indicate that the alleged misleading statements by Larson were somehow connected to the denial of the Emeritus appointment or the non-renewal of plaintiff's adjunct appointment. Moreover, as stated above, plaintiff does not have a protected property interest with regard to these appointments.

Thus, under New Jersey law, plaintiff has an interest in his good name even in the absence of tangible loss. *Id.* Nevertheless, the foregoing authority forecloses a § 1983 claim predicated on the Fourteenth Amendment based upon mere injury to reputation, notwithstanding any claim plaintiff may have under state law.[20]

Moreover, at best it could be said that the law was unclear at the time of Larson's conduct. A federal court in this jurisdiction has yet to recognize a § 1983 claim based upon the deprivation of the State-created interest in reputation under New Jersey law.[21] Thus, under the doctrine of qualified immunity, Larson would incur no liability in this regard. In addition, to recognize such a claim would be in conflict with the well-settled rule that the tort of defamation does not rise to the level of a deprivation actionable under § 1983.

Defendants concede that the memoranda from Larson to Dean Buchanan identifying plaintiff as one of those to whom the Panel's finding of misconduct pertained was an oversight. Indeed, the memoranda from Larson to Buchanan could have been interpreted by members of NJDS and the larger academic community as a finding of wrongdoing as to plaintiff. In the interest of fairness, UMDNJ should remove this document from plaintiff's personnel file or take other steps to correct any inaccurate or misleading statements therein concerning plaintiff's involvement in the scientific misconduct. The Due Process Clause, however, does not require such action, nor does it provide plaintiff with a cause of action for the deprivation of his civil rights.

## IV. Conspiracy, Entity Liability and the Individual Defendants

As no underlying violation has been shown, there is no basis for a conspiracy claim. Moreover, there is no basis for liability as to UMDNJ because its policies, practices and procedures did not cause a violation of plaintiff's civil rights. Therefore, these claims must be dismissed.

In addition, plaintiff has named defendants who have only a collateral relationship to his grievances. With regard to President Bergen, his mere title alone is insufficient to establish liability under 42 U.S.C. § 1983. *See Monell v. Dep't of Soc. Services*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Moreover, the record shows that plaintiff approved of his leadership. In his March 11, 1995 letter to Bergen, plaintiff stated that Bergen's reappointment was "fortunate" for UMDNJ, which would be "enriched by his decision to stay." (Defendant's Aff., IB at 182). Plaintiff also stated that "[y]ou [Bergen] will furnish the experience and leadership to provide an accelerated move into the next 25 years." (*Id.*). It is entirely unclear how, if at all, this defendant was responsible for the alleged retaliation since plaintiff's criticisms in the past and allegations here concern Buchanan, Catalanotto and Larson.

Likewise, the record fails to show that defendants Putterman and Kligerman violated his rights. These individuals had a limited role in the underlying events. Moreover, his allegations concerning Kligerman concern her failure to provide adequate legal advice to the other defendants. The allegation that this defendant was negligent in rendering legal advice cannot sustain a claim under 42 U.S.C. § 1983. Thus, even had the record raised a genuine issue with respect to Buchanan, Catalanotto and Larson, the action could not be maintained against the other defendants.

---

20. Plaintiff has not asserted any claim(s) under New Jersey law in this action.

21. The effect, if any, *Doe* may have on § 1983 jurisprudence is unclear. *See Artway v. Attorney General*, 81 F.3d 1235, 1268–69 ("Artway has no [constitutionally protected] interest in reputational damage ... Artway may have a liberty interest in *notification* under state law triggering federal due process protections ... but ... his challenges to notification are not yet ripe.")(citing *Doe*, 142 N.J. at 103–106, 662 A.2d 367), *reh'g denied*, 83 F.3d 594 (3d Cir.1996).

## CONCLUSION

For the aforementioned reasons, defendants' motion will be granted and this action dismissed in its entirety. Accordingly, plaintiff's motion will be denied. An appropriate order follows.